# UNITED STATES DISTRICT COURT

for the

Southern District of California



FILED

AUG 23 2019

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                                    DEPUTY

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>SAMSUNG SM-G928V<br>Serial: R38GC03YG0Y; IMEI: 9900 0588 7560 515<br>ICCID: 8952 0202 1752 0815 259 | Case No.<br><br>'19 MJ 3576 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the  Southern  District of  California , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 952, 960 | Importation of Cocaine |

The application is based on these facts:

See attached affidavit of HSI Special Agent Krystal Williams.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Krystal Williams, HSI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 8/23/19

*Judge's signature*

City and state: San Diego, California      Hon. Bernard G. Skomal, United States Magistrate Judge
*Printed name and title*

Case 3:19-mj-03576-BGS   Document 1   Filed 08/23/19   PageID.2   Page 2 of 11

# AFFIDAVIT

I, Special Agent Krystal Williams, being duly sworn, hereby state as follows:

## INTRODUCTION

1. This affidavit supports an application for a warrant to search the following:

> SAMSUNG SM-G928V
> Serial Number: R38GC03YG0Y
> IMEI: 9900 0588 7560 515
> ICCID: 8952 0202 1752 0815 259
> **(Target Device)**

as described in Attachment A, and seize evidence of crimes, specifically, violations of Title 21, United States Code, Section(s) 952 and 960 – Importation of Controlled Substances. This search supports an investigation and prosecution of Alberto FONCERRADA Osuna ("Defendant") for the crimes mentioned above. A factual explanation supporting probable cause follows.

2. The **Target Device** was seized on July 6, 2019 at the San Ysidro Port of Entry in San Diego, California. The **Target Device** was seized from FONCERRADA pursuant to his arrest for importation of federally controlled substances. The **Target Device** is currently stored as evidence at Homeland Security Investigations Resident Agent in Charge at 2420 Vista Way, Oceanside, California 92054.

3. Based on the information below, there is probable cause to believe that a search of the **Target Device** will produce evidence of the aforementioned crimes, as described in Attachment B.

4. The information contained in this affidavit is based upon my experience and training, and consultation with other federal, state, and local law enforcement agents. The evidence and information contained herein was developed from interviews and my review of documents and evidence related to this case. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Device**, it does not contain all of the information known by me or other federal agents regarding

this investigation, but only contains those facts believed to be necessary to establish probable cause.

## EXPERIENCE AND TRAINING

5. I am a "law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7), who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516. I have been a Special Agent with the United States Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), since October 2009. I am currently assigned to the HSI RAC Oceanside, California. My current duties include the investigation of trafficking and smuggling of narcotics and narcotics proceeds into and out the United States.

6. During the course of my duties, I have worked and participated in hundreds of investigations involving the smuggling and trafficking of narcotics and narcotics proceeds into, throughout, and out of the United States and Mexico. I have executed and participated in dozens of search and arrest warrants for violations of both state and federal offenses related to the trafficking, sales, and distribution of illegal narcotics. I have also worked with and conferred with other agents with extensive experience in narcotics smuggling investigations and investigations involving the transportation of illegal narcotics and drug proceeds. In the course of my duties, I have worked as the case agent responsible for directing specific drug-related investigations. I have also conducted surveillance, observed and recorded movements of individuals trafficking in drugs and of those suspected of trafficking in drugs; participated in international and domestic controlled deliveries of narcotics, executed numerous arrests for drug-related offenses; and interviewed defendants, witnesses, and informants relating to the illegal trafficking of controlled substances. Through these experiences, I have gained a working knowledge and insight into the normal operational habits of smugglers, with particular emphasis on those who attempt to import contraband into the United States from Mexico.

7. I graduated from the Federal Law Enforcement Training Center where I have received training in investigating various narcotics-related offenses, including the importation of narcotics and narcotics trafficking. I have had training in the methods used by narcotics traffickers to import and distribute drugs and operate detailed distribution networks. My training has also included the use of cellular and digital telephones and other electronic devices used by narcotics traffickers in the normal course of their illicit activities. I have a Master's degree from Western Illinois University in Law Enforcement and Justice Administration. Prior to my career with HSI, I worked as an Officer with U.S. Customs and Border Protection (CBP).

8. Through these investigations, my training and experience, and conversations with other agents and law enforcement personnel, I have become familiar with the methods used by narcotics traffickers to manufacture, smuggle, safeguard and distribute narcotics and to collect and launder narcotics-related proceeds. I have become familiar with methods employed by narcotics trafficking organizations, and their sophisticated tactics, which include the utilization of debit calling cards, prepaid cellular phones, public telephones, wireless communications technology such as cellular telephones and pagers, counter surveillance, elaborately planned smuggling schemes tied to legitimate businesses, false or fictitious identities, and coded communications and conversations. I am also familiar with the trafficking patterns employed by narcotics smuggling organizations, including the concealment of narcotics in vehicles and the subsequent smuggling of those narcotics into the United States. Through my investigations, I have learned that there are numerous methods utilized by drug trafficking organizations to conceal narcotics in vehicles, including non-factory compartments, in natural voids, and deep concealment within the engine. I have seen numerous concealment methods and am familiar with locating and identifying these concealment methods through visual inspection of vehicles. I have also spoken with agents, as well as other law enforcement officers, about their experiences and the results of their investigations and interviews. I have become

knowledgeable of the methods and modes of narcotics operations and the patterns of narcotics abuse and trafficking.

9. I have spoken with other agents about their experiences and the results of their investigations and interviews. I have learned that narcotics traffickers often require the use of one or more telephone facilities to negotiate times, places, schemes, and manners for importing, possessing, concealing, manufacturing, and distributing controlled substances and for arranging the disposition of proceeds from the sale of controlled substances. Based on my training and experience, I have learned that load drivers smuggling controlled substances across the border are often in telephonic contact with co-conspirators immediately prior to and following the crossing of the load vehicle, at which time they receive instructions on how to cross and where and when to deliver the controlled substances.

10. Moreover, I have learned that narcotics traffickers often require the use of one or more telephone facilities to negotiate times, places, schemes and manners for importing, possessing, concealing, manufacturing and distributing controlled substances and for arranging the disposition of proceeds from the sale of controlled substances. I have learned that professional narcotics operations depend upon maintaining their extensive contacts. The use of telephones is essential in maintaining timely long-distance and local contacts with the original suppliers and those down the organizational chain to the local traffickers. The telephone enables narcotics dealers to maintain contact with narcotics associates, narcotics suppliers, and narcotics customers. I also have learned that narcotics traffickers often use fraudulent information to subscribe to communication facilities, especially cellular telephones, and frequently change communications facilities to thwart law enforcement efforts to intercept their communications.

11. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics smuggling

4

investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

    a. Drug smugglers will use cellular/mobile telephones because they are mobile and they have instant access to telephone calls, text, web, and voice messages.

    b. Drug smugglers will use cellular/mobile telephones because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit.

    c. Drug smugglers and their accomplices will use cellular/mobile telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations.

    d. Drug smugglers will use cellular/mobile telephones to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo.

    e. Drug smugglers will use cellular/mobile telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings.

    f. Drug smugglers and their co-conspirators often use cellular/mobile telephones to communicate with load drivers who transport their narcotics and/or drug proceeds.

    g. The use of cellular/mobile telephones by drug smugglers tends to generate evidence that is stored on the cellular/mobile telephones, including, but not limited to emails, text messages, photographs, audio files, call logs, address book entries, IP addresses, social network data, and location data.

12. Subscriber Identity Module (SIM) Cards, also known as subscriber identity modules, are smart cards that store data for cellular/mobile telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Much of the evidence generated by a smuggler's use of a cellular/mobile telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

13. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics smuggling investigations, and all the facts and opinions set forth in this affidavit, I have learned that cellular/mobile telephones often contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, I have learned, based upon my training, education, and experience that searches of cellular/mobile telephones associated with narcotics smuggling investigations yield evidence:

   a. tending to identify attempts to import cocaine or some other federally controlled substance from Mexico into the United States;

   b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of cocaine or some other federally controlled substance from Mexico into the United States;

   c. tending to identify co-conspirators, criminal associates, or others involved in the importation of cocaine or some other federally controlled substance from Mexico into the United States;

   d. tending to identify travel to or presence at locations involved in the importation of cocaine or some other federally controlled substance from Mexico into the United States, such as stash houses, load houses, or delivery points;

   e. tending to identify the user of, or persons with control over or access to, the cellular/mobile telephone; and/or

   f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

14. On July 6, 2019 at approximately 4:58 a.m., Alberto FONCERRADA Osuna applied for entry into the United States from Mexico via the San Ysidro Port of Entry (POE), driving a white 2006 Dina commercial autobus bearing California license plates. The CBPO at primary inspection obtained two negative declarations from FONCERRADA, who claimed he was going to Disneyland. The CBPO then received a computer-generated alert and referred the bus for further inspection.

15. A CBP Canine Enforcement Officer (CEO) was tasked with conducting a canine screen of the vehicle. Utilizing his Human/Narcotics Detection Dog (HNDD), the CBP CEO received a positive alert to a trained odor emanating from the bus. At this time, FONCERRADA was escorted to the security office. The bus was transported under escort to the Otay Mesa POE cargo facility to accommodate further inspection.

16. At approximately 8:00 a.m., a CBPO ran the bus through the Z-Portal X-Ray and observed anomalies in the front floor area. CBPOs conducted additional inspection of the bus and discovered black wrapped packages that were vacuum-sealed with clear plastic and strung together by black and brown ribbons. A total of 26 packages weighing approximately 29.28 kilograms were removed from the floor compartment. The packages were probed and tested positive for cocaine.

17. The **Target Device** was discovered and seized by CBP at the time of FONCERRADA's arrest.

18. HSI assumed custody of the **Target Device**. During the post-arrest interview, FONCERRADA denied knowledge of the narcotics in the bus. He also told agents that he always has the keys to the bus, but later stated that when he travels to the United States and stays at a hotel for work, he usually leaves the keys to the bus and a backpack in the bus while he is at the hotel. Following the post-arrest interview of FONCERRADA, agents retrieved the **Target Device** from FONCERRADA's

personal property. FONCERRADA willingly gave agents the passcode for the **Target Device**.[1]

19. Based upon my experience investigating narcotics traffickers and the particular investigation in this case, I believe that FONCERRADA likely used the **Target Device** to coordinate the importation of federally controlled substances into the United States. In addition, I believe that recent calls made and received, telephone numbers, contact names, electronic mail (e-mail) addresses, appointment dates, text messages, pictures and other digital information may be stored in the memory of the **Target Device,** which may identify other persons involved in narcotics trafficking activities. Accordingly, based upon my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that information relevant to the narcotics smuggling activities of FONCERRADA such as telephone numbers, made and received calls, contact names, electronic mail (e-mail) addresses, appointment dates, messages, pictures, and other digital information are stored in the memory of the **Target Device**.

20. Finally, I also have learned that narcotics trafficking activities entail intricate planning to successfully evade detection by law enforcement. In my professional training, education and experience, I have learned that this requires planning and coordination in the days, weeks, and often months prior to the event. Given this, I request permission to search the **Target Device** for items listed in Attachment B beginning on April 6, 2019, up to and including July 6, 2019.

### METHODOLOGY

21. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is

---

[1] On July 6, 2019, agents examined some of the **Target Device**'s contents. In an abundance of caution, I ask the court not to consider information agents may or may not have seen during this examination of the **Target Device** in determining whether there is probable cause for the requested warrant.

8

subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" or "airplane mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard-drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

22. Following the issuance of this warrant, I will collect the **Target Device** and subject it to analysis. All forensic analysis of the data contained within the **Target Device** and memory card(s) will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

23. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

## CONCLUSION

24. Based on all of the facts and circumstances described above, there is probable cause to conclude that FONCERRADA used the **Target Device** to facilitate violations of Title 21, United States Code, Section(s) 952 and 960.

25. Because the **Target Device** was promptly seized during the investigation of FONCERRADA's smuggling activities and has been securely stored, there is probable cause to believe that evidence of illegal activities committed by FONCERRADA continues to exist on the **Target Device**. As stated above, I believe that the date range for this search is from April 6, 2019 through July 6, 2019.

26. WHEREFORE, I request that the court issue a warrant authorizing law enforcement agents and/or other federal and state law enforcement officers to search the items described in Attachment A, and the seizure of items listed in Attachment B, using the methodology described above.

I swear the foregoing is true and correct to the best of my knowledge and belief.

_____
Special Agent Krystal Williams
HSI Special Agent

Subscribed and sworn to before me this __23__ day of August, 2019.

_____
Hon. Bernard G. Skomal
United States Magistrate Judge

10